IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

LEYANIS TAMAYO ESPINOZA, et al.         PETITIONERS-PLAINTIFFS

Vs.                          CIVIL ACTION NO. 5:20-cv-106-DCB-MTP

WARDEN SHAWN GILLIS                         RESPONDENT-DEFENDANT

ORDER

THIS MATTER is before the Court on Petitioners' Motion for a Temporary Restraining Order. [ECF No. 3] This Motion was filed in Petitioners' ongoing habeas matter that challenges their continued immigration detention. Petitioners allege their detention violates 28 U.S.C. § 2241. Having carefully considered the parties' submission, the record, and the applicable law, the Court finds as follows:

BACKGROUND

Petitioners filed their habeas petition alleging that their continued civil immigration detention violates their right to substantive and procedural due process under the Fifth Amendment to the United States Constitution and the right to be free from cruel and unusual punishment under the Eighth Amendment. [ECF No. 1] at 31-33. The petitioners are being held in the Adams County

1

Detention Center ("ACDC"). Six petitioners remain in this suit[1], and the Habeas Petition describes them as follows:

> **Leyanis Tamayo Espinoza** is 46 years old and suffers from diabetes, hypertension, chronic renal issues, and malnutrition. These conditions qualify as disabilities under the Rehabilitation Act.
>
> **Edilia Del Carmen Martinez** is 53 years old and suffers from diabetes, which qualifies as a disability under the Rehabilitation Act.
>
> **Jose Ruben Lira Arias** is 46 years old and suffers from diabetes and hypertension which qualify as disabilities under the Rehabilitation Act.
>
> **Ndikum Keshia Angu Anjoh** is 19 years old and suffers from chronic respiratory distress, which qualifies as a disability under the Rehabilitation Act.
>
> **Anthony Baptiste** is 59 years old and suffers from hypertension and pre-diabetes, He had been receiving disability benefits due to injuries suffered in a car accident prior to his detention, and these additional conditions qualify as disabilities under the Rehabilitation Act.
>
> **Linda Chuo Fru** is 26 years old and suffers from Hepatitis B, high blood pressure, and other conditions that are untreated in detention. Hepatitis B and hypertension qualify as disabilities under the Rehabilitation Act.

The petitioners have not included medical records for the individual petitioners. The medical history is provided by declaration of the petitioners.

Upon receipt of the petitioners' emergency § 2241 petition and Motion for a Temporary Restraining Order ("TRO"), the Court

---

[1] Petitioner Viankis Maria Yanes Pardillo has been granted asylum and was released on April 29, 2020, making her petition moot. [ECF No. 15] at n.1.

held a telephonic conference and set a briefing schedule. On May 19, 2020, the Court held a telephonic hearing on the Motion. On May 22, 2020, the petitioners filed a Supplemental Authority in Support of their Motion for Temporary Restraining Order. The Government filed its response to the supplementation on June 1, 2020. The Motion is now ripe for disposition and, for the reasons discussed below, the Motion for a Temporary Restraining Order will be denied.

**COVID-19**

In recent months, COVID-19 has been declared a global health pandemic by the World Health Organization. See Williams v. Barr, 2020 WL 2193448, at *1 (M.D. Pa. May 6, 2020). "Humans have no immunity to the virus and, currently, there is no cure, vaccine, or known anti-viral treatment." Id. The primary method for mitigating the spread of this virus is through social distancing, i.e., breaking the chain of transmission by staying, generally, at least six feet apart. See id.

"Most individuals who are infected develop mild or moderate respiratory symptoms and recover with no medical intervention, but in a minority of cases individuals experience serious illness or death." Id. However, some populations – the elderly and those with underlying preexisting medical conditions – are more susceptible to developing serious illness or death. Id.

ANALYSIS

**Temporary Restraining Order**

Rule 65 of the Federal Rules of Civil Procedure sets out the general procedure for injunctive relief in federal courts. If there is an adversary hearing – as there was in this case – a temporary restraining order may be treated as a preliminary injunction. Courts look to four factors when evaluating whether a temporary restraining order or preliminary injunction is appropriate.

A temporary restraining order is an extraordinary and drastic remedy, that should not be granted unless the movant establishes the following elements: (1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) granting the preliminary injunction will not disserve the public interest. Karaha Bodas Co. v. Perusahaan Pertambangan, 335 F.3d 357, 363 (5th Cir. 2003). The Fifth Circuit has repeatedly cautioned that "a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements.'" Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 196 (5th Cir. 2003)(citing Mississippi Power

4

& Light Co. v. United Gas Pipeline, 760 F.2d 618, 621 (5th Cir. 1985).

**Merits of Petitioners' Claims**

Before turning to the likelihood of success on the merits of the petitioners' claims, the Court will quickly address the respondent's contention that the petitioners may not seek their release from custody through a § 2241 habeas petition. While the petitioners are challenging the conditions of their confinement, a civil rights action, their requested relief is immediate release from detention.

Challenges to the duration of confinement should be brought as a habeas petitioner. See Preiser v. Rodriguez, 411 U.S. 475, 489 (1973) (The United States Supreme Court held that a challenge by a prisoner to the fact or duration of his confinement and seeking an immediate or earlier release from that confinement must be pursued through a habeas corpus proceeding rather than in an ordinary civil rights action); see also Davis v. Fechtel, 150 F.3d 486, 490 (5th Cir. 1998) ("Simply put, habeas claims involve someone's liberty, rather than mere civil liability."); see also Cook v. Tex. Dep't of Criminal Justice Transitional Planning Dep't, 37 F.3d 166, 168 (5th Cir. 1994) (citations omitted)(finding claims that would entitle prisoner to accelerated release are not properly pursued in a § 1983 conditions of confinement case); Barrera v.

Wolf, 2020 WL 1904497, at *4 (S.D. Tex. April 17, 2020) ("Because Plaintiff's are challenging the fact of their detention as unconstitutional and seek relief in the form of immediate release, their claims fall squarely in the realm of habeas corpus"). Here, the requested relief, immediate release from detention, permits the petitioners to proceed with their habeas petition.

Turning to the merits of the claim, the Government argues that no constitutional violation has occurred. First, the Government asserts that the conditions of confinement do not amount to the unconstitutional punishment of a civil detainee, in violation of the Fifth Amendment. Second, the Government argues that Adams County Detention Center ("ACDC") has not been deliberately indifferent to the petitioners' medical needs.

   i.   Conditions of Confinement

To succeed on their claim that the conditions at ACDC violate the Constitution, petitioners must demonstrate that the conditions of confinement amount to punishment of the detainee. In making that determination, the Court must consider whether the conditions and restrictions of the detention center are rationally connected to a legitimate governmental objective. See Bell v. Wolfish, 441 U.S. 520, 539 (1979). If not, then the Court may infer that the purpose of the governmental action is unconstitutional punishment.

The Supreme Court has recognized that ensuring the presence of detainees at their immigration hearings along with the effective management a detention facility once an individual is confined, constitutes legitimate governmental interests. See <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830, 836 (2018); <u>Demore v. Kim</u>, 538 U.S. 510, 520-22; <u>Zadvydas v. Davis</u>, 533 U.S. 678, 690-91 (2001). Additionally, the Government has a legitimate interest in reducing the flight risk posed by prisoners facing removal. See <u>Gutierrez-Soto v. Sessions</u>, 317 F.Supp.3d 917, 931 (W.D. Tex. 2018). The petitioners do not assert that there is no legitimate government interest but claim that detaining the petitioners is not reasonably related to that interest in light of the pandemic sweeping the nation. To support their claims, petitioners point to two primary facts: (1) ICE detainees who are represented are almost guaranteed to show up for their immigration hearings, and (2) ICE has methods – alternative to detention – that can ensure its legitimate interests are met.

When viewed under <u>Bell</u>'s standard that the detention be rationally related to a legitimate government interest, the petitioners' conditions of confinement do not amount to unconstitutional punishment. See e.g., <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979). First, the Supreme Court has made it clear that the Government has a legitimate interest in preventing the petitioners from absconding and avoiding removal. Second, the petitioners'

continued confinement is reasonably related to that legitimate governmental interest as it guarantees that the petitioners will attend their deportation proceedings. A well-reasoned opinion out of the Middle District of Pennsylvania found:

> Although there are other methods that may help ensure that [the petitioners] compl[y] with deportation proceedings, detainment is the only method that guarantees the fulfillment of the Government's goal. Moreover, the relevant question is not whether there are other, less restrictive methods at the Government's disposal, or even whether the Government's chosen course of action is the wisest or best way to proceed. The only limitation on the Government's ability to act is that the chosen course of action be reasonably related to its legitimate goal. Here, that standard is clearly satisfied.

See Williams, 2020 WL 2193448, at *5. This Court agrees with the Williams analysis. While there are other methods available to ICE that may be more appropriate considering the circumstances, it is not enough to defeat the reasonably related standard as set forth in Bell.

The conditions at ACDC do not negate the Court's determination that the conditions of confinement do not amount to an unconstitutional punishment. Despite the unique concerns posed by detention facilities regarding the spread of this virus, CDC guidelines specifically contemplate that individuals will be confined within detention facilities during this pandemic.[2] As

---

[2] See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in

such, the CDC has provided recommendations for detention facilities to mitigate the spread of COVID-19. ACDC has made numerous changes to its operating procedure in response to COVID-19 and asserts that it is following CDC guidelines. The Court is not persuaded by the allegation that there is no course of action that ACDC can take to mitigate the spread of COVID-19. The petitioners claim that the mitigation efforts of ACDC are inadequate, which the Government disputes by presenting the following measures taken to combat the virus:

   If a detainee has had known exposure to another individual with COVID-19, ACDC places them in a "cohort" with other exposed individuals for fourteen days and monitors them for fever and respiratory issues. [ECF No.15] at 3.

   Importantly, ACDC is not overcrowded, but is operating at approximately one third (1/3) capacity. [ECF No. 15-1] at 3. The facility can hold 2,300 detainees but currently houses 832. [ECF No. 15-2] at 3. When a new detainee is brought to ACDC, they are screened for health issues and questioned about any exposure to COVID-19. [ECF No. 15] at 3. Additionally, all staff and vendors are screened for body temperatures before they enter the facility. Id. at 5. Anyone with responses to questions or a body temperature

---

Correctional and Detention Facilities, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance- correctional-detention.html (last visited May 11, 2020).

that suggests exposure to COVID-19 is not allowed to enter the facility.  Id.  Further, if an employee is not allowed to work because of the screening process, the employee is sent home with full pay.  Id.  Thus, as the government asserts, there is no incentive for an employee to provide inaccurate answers. Id.

ACDC has also increased sanitation efforts to reduce the spread of the virus. ACDC has increased the amount of liquid soap available and increased the frequency of cleaning cycles.  Id. at 4.  In addition to bleach, ACDC uses a chemical that kills COVID-19 to clean throughout the facility.  Id. at 4-5.  High contact areas are cleaned every hour.  Id. at 5.  In areas where detainees are suspecting of having COVID-19 are housed, items are cleaned in between each use.  Id.  There is also hand sanitizer throughout the facility.  Id.

ACDC has also imposed a "no contact" requirement for essential professional visits at the facility and has suspended all in person social visitation and tours of the facility. Id. Since April 13, 2020, ACDC has provided masks to all detainees and staff.  Id.  In housing areas where detainees are suspected of having COVID-19, the staff entering the area wears full personal protective equipment ("PPE").  Id. And only certain staff can enter the areas where individuals have or are suspected of having COVID-19.  Id.

10

ACDC also monitors its gloves and other PPE to ensure it has sufficient amounts. Id.

Individuals with confirmed cases of COVID-19 are being housed in separate, contained units or in negative pressure rooms. Id. at 4. ACDC tests detainees consistent with CDC guidelines for testing. Id. As of the date of the Government's response, only one of the six (6) regular housing units has had positive or suspected cases of COVID-19 and none of the petitioners/plaintiffs are housed in that unit. Id. If someone is suspected of or has been diagnosed with COVID-19, they are housed in an isolation pod, and their meals and medical services take place within that pod only. Id.

The petitioners assert that there have been situations in which symptomatic detainees were not treated or isolated. [ECF No. 5] at 7. However, upon reviewing the relevant declarations, the Court either found them to lack information or to describe a situation where ACDC offered treatment and isolated detainees who it suspected had contact with the virus. [ECF No. 4-1](detainee states that she believes she has a reoccurring fever, but medical staff took her temperature and told her it was fine); [ECF No. 4-3](describing a situation where two men from petitioner's tank were potentially exposed to the virus and, later that day, ACDC removed the two men from the tank); [ECF No. 4-4](noting that a group of women transferred to ACDC were not allowed out of their

11

dormitory, that the women ate in their dormitory instead of the dining hall, and that it appeared they were quarantined for "about two weeks").

This is an ever-evolving situation in which ACDC, the CDC, and ICE are adapting and responding to the virus as more information comes to light. The measures enacted by the ACDC ensure that the petitioners' conditions of confinement are not unconstitutionally overcrowded or unsanitary. It is true that detention facilities do not accommodate the type of social distancing that individuals may undertake in their homes. However, ACDC is operating far below its capacity, and the reality is that individuals will be confined within detention facilities during this pandemic.

   ii.   Deliberate Indifference to Medical Needs

When a prisoner alleges inadequate medical care, prison officials violate the Fifth Amendment when "they exhibit deliberate indifference to serious medical needs of prisoners." See Williams, 2020 WL 2193448, at *6. Deliberate indifference is an extremely high standard to meet, and the plaintiff must satisfy the "subjective and objective" requirements of the Eighth Amendment inquiry. See Valentine v. Collier, 956 F.3d 797, 801 (5th Cir. 2020).

The plaintiff must show an objectively intolerable risk of harm. Id. The plaintiff must also show that prison officials have

12

a subjective state of mind more blameworthy than negligence, and akin to criminal recklessness. Id. To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." Id. The "incidence of diseases or infections, standing alone," do not "imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks." Id.(quoting Shepherd v. Dallas Cty., 591 F.3d 445, 454 (5th Cir. 2009)). Instead, the plaintiff must show a denial of "basic human needs." Id.

The Fifth Circuit states that it is incorrect for courts to treat "inadequate measures as dispositive of the Defendants' mental state." Id. A general awareness of the dangers posed by COVID-19 does not show that defendants "subjectively believe the measures they are taking are inadequate." Id. at 802. Mere disagreement with the facility's medical decisions as to how to deal with the COVID-19 outbreak in a detention setting does not establish deliberate indifference. Id. In this case, the evidence shows that ACDC has taken and continues to take measures – informed by guidance from the CDC – to abate and control the spread of the virus. The petitioners have offered no evidence that the officials

13

at ACDC have acted with deliberate indifference to their medical needs.

In the case at hand, the petitioners have not shown that they are likely to succeed on the merits of their Writ of Habeas Corpus. The petitioners have failed to demonstrate either that their detention amount to a punishment in violation of the Constitution, or that officials within the ACDC are acting with deliberate indifference to their medical needs. ACDC is operating at approximately one-third capacity, it has enacted numerous measures to mitigate the spread of COVID-19 in the facility, there is no evidence that the prison officials have a subjective belief that they are taking inadequate measures to combat the pandemic, and there is a rationally related governmental interest in keeping ICE detainees within ACDC.

**Likelihood of Suffering Irreparable Harm**

The petitioners must show "that they will suffer irreparable injuries <u>even after</u> accounting for the protective measures" in place. <u>Valentine</u>, 956 F.3d at 804. There is no evidence to support such a finding in this case. In their Reply [26], petitioners note that as of May 5, 2020, ACDC had 15 confirmed cases of COVID-19. As of June 2, 2020, ACDC has reported only two additional confirmed cases. <u>See</u> ICE, <u>COVID-19 Guidance</u> (last visited June 2, 2020), https://www.ice.gov/coronavirus.  In the hearing held on May 19,

14

2020, the Government informed the Court that fourteen of the fifteen detainees who were confirmed COVID-19 cases have recovered from the illness.

In their Supplemental Authority, the petitioners note that two (2) ACDC employees have also tested positive. The Government submitted a Declaration of Warden Shawn Gillis, who explains that one of the employees who tested positive is an administrative staff member who developed symptoms while at home and did not work within the facility or have access to detainees, and the other employee, a detention officer, was off work when he developed symptoms and that he sought medical attention and was immediately tested and quarantined per CDC regulations. Both employees have recovered.

The Court acknowledges the difficulty of accurately confirming the number of cases because asymptomatic carriers may not be tested. However, there is no evidence before the Court that there has been any sort of drastic increase in cases at the facility. ACDC has had confirmed cases of COVID-19 as early as April 2020. See [ECF No.5] at 5. Despite having COVID-19 in the facility for well over a month, there have been no fatalities[3] and only one person[4] has needed medical care outside the capabilities

---

[3] See ICE, COVID-19 Guidance (last visited June 2,2020) https://www.ice.gov/coronavirus

[4] See [ECF No. 15] at 3(noting, at the time of the Government's Response, that only one detainee had been transferred to a local hospital while the remaining eleven (11) confirmed COVID-19 cases were treated in ACDC).

of ACDC. Additionally, there is no evidence that there has been a extreme number of detainees who present symptoms of the virus.

ICE asserts that it is conducting tests based on CDC guidelines and the Court is hesitant to require ACDC to provide additional testing that would exceed the CDC's guidelines. The Court recognizes that the Western District of Louisiana recently reviewed a similar situation pertaining to testing in the case Dada v. Witte, No. 1:23-cv-458, 2020 WL 2614616, at *2 (W.D. La. May 22, 2020)(questioning the accuracy of the minimal spread of the virus throughout the ICE facility, and speculating that the facility was moving detainees to other ICE facilities). However, the Court in Dada clearly stated "[a]ll of this is to say that the PARTICULAR fact pattern upon which the court's ruling is based, that is as to these PARTICULAR plaintiffs, could very well be different next week… [t]he case, therefore, has no precedential value as to any other detainee at any other time." Id. at 1.

**Whether Threatened Injury Outweighs the Harm to Non-Movant and the Public Interest**

The Government succinctly explains the significant public interest in maintaining and enforcing the United States' immigration laws and the potential harm to the Government if its ability to enforce immigration laws is disrupted:

> "It is well-settled that the public interest in enforcement of United States immigration laws is significant. Landon v. Plasencia, 459 U.S. 21, 34 (1982)

16

> ("The government's interest in efficient administration of the immigration laws at the border is also weighty."); United States v. Martinez- Fuerte, 428 U.S. 543, 556-58 (1976); Blackie's House of Beef, Inc. v. Castillo, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."); see also Nken v. Holder, 556 U.S. 418, 435 (2009)("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permit[s] and prolong[s] a continuing violation of United States law." (internal quotation marks omitted))." [ECF No. 15] at 15.

This Court finds the Government's position to be well taken and agrees that the balance of interests favors the Warden. While the petitioners argue that the Court's decision can be narrowly decided and not create a sweeping and/or generalized outcome, there is no cognizably narrow limitation. If the Court grants the petitioners' TRO, there would be few restrictions preventing the Court from releasing every ICE detainee who has an underlying illness or is of a certain age. See e.g. United Stated v. Fitzgerald, No. 2:17-cr-00295-JCM-NJK, 2020 WL 1433932, at *2 (D. Nev. Mar. 24, 2020) ("[T]he Court cannot release every detainee at risk of contracting COVID-19 because the Court would then be obligated to release every detainee.").

## CONCLUSION

IT IS HEREBY ORDERED that the petitioners' Motion for a Temporary Restraining Order is DENIED without prejudice.

SO ORDERED, this the 3rd day of June, 2020.

17

                                                                   _/s/ David Bramlette_____

                                                                   UNITED STATES DISTRICT JUDGE